**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

|  |  |  |
|---|---|---|
| **MAYOR AND CITY COUNCIL OF BALTIMORE,** City Hall 100 N. Holliday St. Baltimore, MD 21202 | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | **L08CV 062** |
| v. | ) ) | Case No. _____ |
| **WELLS FARGO BANK, N.A.** 464 California Street San Francisco, CA 94104 | ) ) ) ) ) | |
| and | ) ) | |
| **WELLS FARGO FINANCIAL LEASING, INC.,** 207 9th Street Des Moines, IA 50307 | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

### NATURE OF THE ACTION

1.      The City of Baltimore is facing an unprecedented crisis of residential
mortgage foreclosures.  From the first to the second quarter of 2007 foreclosure activity
in the City increased five-fold.  Since 2000, more than 33,000 homes have been subjected
to foreclosure filings.  The foreclosure crisis has caused severe economic damage to the
City.  The high rate of foreclosures has resulted in lost revenue in property taxes;

additional costs in social services and police and fire protection; and significant administrative and legal costs.

2.     In Baltimore, the foreclosure crisis has hit African-American neighborhoods and homeowners the hardest.  Foreclosure rates are significantly higher in Baltimore's minority neighborhoods, due in large part to the practice of "reverse redlining."  In contrast to "redlining," which involves denying *prime* credit to specific geographic areas because of the racial or ethnic composition of the area, reverse redlining involves the targeting of an area for the marketing of deceptive, predatory or otherwise unfair lending practices because of the race or ethnicity of the area's residents.  Reverse redlining has repeatedly been held to violate the federal Fair Housing Act.

3.     Defendant Wells Fargo Bank, N.A., is one of the largest mortgage lenders in Baltimore and the country at large.  Together with Defendant Wells Fargo Financial Leasing, Inc. (collectively "Wells Fargo"), it is also one of the leading causes of the disproportionately high rate of foreclosures in Baltimore's African-American neighborhoods.  In 2005 and 2006, for example, two thirds of Wells Fargo's foreclosures were in Baltimore City census tracts that are more than 60% African-American, while only 15.6% were in tracts that are less than 20% African-American.  Wells Fargo's foreclosure rate for loans in African-American neighborhoods is nearly double the overall City average, while the rate for its loans in white neighborhoods is less than half of the average.

4.     Wells Fargo's disproportionately high foreclosure rate in Baltimore's African-American neighborhoods is the result of reverse redlining.  Wells Fargo has been, and continues to be, engaged in a pattern or practice of unfair, deceptive and discriminatory lending activity in Baltimore's minority neighborhoods that have the

2

effect and purpose of placing inexperienced and underserved borrowers in loans they cannot afford. These practices maximize short-term profit to Wells Fargo without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods.

5.      Wells Fargo's lending practices, targeted in this manner at Baltimore's underserved and vulnerable minority neighborhoods, have resulted in the disproportionately high rate of foreclosure in Baltimore's African-American communities, caused substantial and irreparable damage to these neighborhoods, and caused direct and continuing financial harm to the City of Baltimore.

6.      This suit is brought pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 *et seq.*, by the Mayor and City Council of Baltimore ("Baltimore" or "City") to seek redress for the injuries caused by Wells Fargo's pattern or practice of illegal reverse redlining. Specifically, Baltimore seeks to recover damages for the injuries caused by the foreclosures in Baltimore's minority neighborhoods as a result of Wells Fargo's unlawful, irresponsible, unfair, deceptive, and discriminatory lending practices, and to obtain injunctive and declaratory relief. Absent judicial relief, the extent of the City's injury resulting from Wells Fargo's actions will continue – and potentially accelerate – as the housing market continues to decline.

## PARTIES

7.      Plaintiff Mayor and City Council of Baltimore is a municipal corporation, organized pursuant to Article XI-A of the Maryland Constitution. The City is authorized by the Baltimore City Charter to institute suit to recover damages suffered by the City.

8.      Defendant Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States. Upon information and belief, its

corporate headquarters are located in California.  Wells Fargo Bank, N.A. maintains multiple offices in the State of Maryland and in Baltimore for the purposes of soliciting applications for and making residential mortgage loans and engaging in other business activities.

9.      Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A. that was formerly incorporated in California as a separate company and registered to do business in the State of Maryland under the name Wells Fargo Home Mortgage, Inc. Wells Fargo Home Mortgage, Inc. merged into Wells Fargo Bank, N.A. on May 5, 2004. Wells Fargo Bank, N.A. continues to do business under the name Wells Fargo Home Mortgage, including in the State of Maryland and in Baltimore.

10.     Wells Fargo Bank, N.A. has been the largest or second largest provider of mortgage credit to homeowners in Baltimore since at least 2004.  From 2004 to 2006, Wells Fargo Bank, N.A. made at least 1,285 mortgage loans a year to Baltimore homeowners with a collective value of over $600 million.  Upon information and belief, Wells Fargo Bank, N.A. continues to make loans in Baltimore at a comparable pace.  No other lender made more than 1,000 mortgage loans in Baltimore in each year from 2004 to 2006.

11.     Defendant Wells Fargo Financial Leasing, Inc. is an Iowa corporation that is registered to do business in Maryland.  Upon information and belief, Wells Fargo Financial Leasing, Inc. engages in the solicitation of applications for and origination of residential mortgage loans in Baltimore.

12.     Each of the Defendants was and is the agent, employee, and representative of the other Defendant.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant

4

to such agencies, or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.

14.    Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants conduct business in and are residents of the district and a substantial part of the events and omissions giving rise to the claims occurred in the district.

## FACTUAL BACKGROUND

### A.    The Foreclosure Crisis and Baltimore

15.    Like many cities across the country, Baltimore is facing an unprecedented crisis of residential mortgage foreclosures.  Of the 44 million active mortgages throughout the country currently tracked by the Mortgage Bankers Association ("MBA"), approximately 343,000 entered foreclosure during the third quarter of 2007.  This is the highest rate of foreclosures in more than 35 years.  Overall, nearly 450,000 properties tracked by the MBA were in some stage of foreclosure during the third quarter of 2007, up 30% from the second quarter.

16.    Nationwide, the foreclosure crisis is worsening rapidly and is expected to deteriorate further.  The number of foreclosure filings nearly doubled from the third quarter of 2006 to the third quarter of 2007.  One out of every seventeen mortgage holders is no longer able to make payments on time, the highest rate in over twenty years.  Delinquent payments are a strong indicator of near-term foreclosure filings.  Equally important, approximately 150,000 adjustable rate loans are resetting to higher interest

rates every month.  In 2008, $362 billion in subprime loans will reset to higher rates.  As the housing market continues to decline, many of these adjustments will result in foreclosures.  The Joint Economic Committee of Congress predicts that from 2007 to 2009 there could be nearly 2 million foreclosures nationwide on homes purchased with subprime loans.

17.     The foreclosure crisis in Baltimore is especially severe.  There have been more than 33,000 foreclosure filings since 2000, and the Maryland Department of Housing and Community Development reported in October 2007 that the number of foreclosure-related events in Baltimore – notices of default, foreclosure sales, and lender purchases of foreclosed properties – increased an extraordinary five-fold from the first to the second quarter of this year.

18.     Foreclosures have multiple and far-reaching impacts on the cities in which they occur, especially when they are concentrated in distressed neighborhoods that are already struggling with issues of economic development and poverty.  Foreclosures in these neighborhoods frequently lead to abandoned and vacant homes.  Estimates of the number of vacant homes in Baltimore range from 16,000 to 30,000.  Concentrated vacancies driven by foreclosures cause neighborhoods, especially ones already struggling, to decline rapidly.

19.     One example of how foreclosures and consequent vacancies harm neighborhoods is by reducing the property values of nearby homes.  In Baltimore, as in cities around the country, foreclosures are responsible for the loss of hundreds of millions of dollars in the value of homes.  This, in turn, reduces the City's revenue from property taxes.  It also makes it harder for the City to borrow funds because the value of the property tax base is used to qualify for loans.

20.     Cities with high rates of foreclosure, like Baltimore, also lose revenue from real estate transfer taxes because foreclosures depress the market for home sales. And these cities must spend additional funds for services related to foreclosures, including the costs of securing vacant homes, holding administrative hearings, and conducting other administrative and legal procedures.  The funds expended also include the costs of providing additional police and fire protection as vacant properties become centers of dangerous and illicit activities.

**B.     The Role of Subprime Lending**

21.     The growing crisis of foreclosures in Baltimore and across the nation is due in large part to the rapid expansion of subprime lending.  Subprime lending developed in the mid-1990s as a result of innovations in risk-based pricing and in response to the demand for credit by borrowers who were denied prime credit by traditional lenders.

22.     Prior to the emergence of subprime lending, most mortgage lenders made only "prime" loans.  Prime lending offered uniformly priced loans to borrowers with good credit.  Individuals with blemished credit were not eligible for prime loans. Although borrowers with blemished credit might still represent a good mortgage risk at the right price, prime lending did not provide the necessary flexibility in price or loan terms to serve these borrowers.

23.     In the early 1990s, technological advances in automated underwriting allowed lenders to predict with improved accuracy the likelihood that a borrower with blemished credit will successfully repay a loan.  This gave lenders the ability to adjust the price of loans to match the different risks presented by borrowers whose credit records did not meet prime standards.  Lenders found that they could now accurately price loans

to reflect the risks presented by a particular borrower. When done responsibly, this made credit available much more broadly than had been the case with prime lending.

24.     As the technology of risk-based pricing developed rapidly in the 1990s, so did the market in subprime mortgages. Subprime loans accounted for only 10% of mortgage loans in 1998, but within five years grew to 23% of the market. Currently, outstanding subprime mortgage debt stands at $1.3 trillion, up from $65 billion in 1995 and $332 billion in 2003. These subprime loans have allowed millions of borrowers to obtain mortgages, at marginally increased prices, even though their credit profiles do not qualify them for lower-cost prime loans. They have opened the door to homeownership to many people, especially low- to moderate-income and minority consumers, who otherwise would have been denied mortgages. At the same time, subprime lending has created opportunities for unscrupulous lenders to engage in irresponsible lending practices that result in loans that borrowers cannot afford. This, in turn, has led directly to defaults and foreclosures.

25.     Enticed by the prospect of short-term profits resulting from exorbitant origination fees, points, and related pricing schemes, many irresponsible subprime lenders took advantage of a rapidly rising real estate market to convince borrowers to enter into loans that they could not afford. Often this was accomplished with the help of deceptive practices and promises to refinance at a later date. These abusive subprime lenders did not worry about the consequences of default or foreclosure to their business because once made, the loans were sold on the secondary market.

26.     As the subprime market grew, the opportunities for abusive practices grew with it. These practices, which in recent years have become the target of prosecutors, legislators and regulators, include the following:

a.      Failing to prudently underwrite hybrid adjustable rate mortgages (ARMs), such as 2/28s and 3/27s. After the borrower pays a low "teaser rate" for the first two or three years, the interest rate on these loans resets to a much higher rate that can continue to rise based on market conditions. Subprime lenders often underwrite these loans based only on consideration of whether the borrower can make payments during the initial teaser rate period, without regard to the sharply higher payments that will be required for the remainder of a loan's 30-year term. Irresponsible lenders aggressively market the low monthly payment that the borrower will pay during the teaser rate period, misleading borrowers into believing that they can afford that same low monthly payment for the entire 30-year term of the loan, or that they can refinance their loan before the teaser rate period expires.

b.      Failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity. Such refinanced loans strip much or even all of that equity by charging substantial new fees, often hiding the fact that the high settlement costs of the new loan are also being financed. Lenders that aggressively market the ability of the borrower to pay off existing credit card and other debts by refinancing mislead borrowers into believing that there is a benefit to consolidating all of their debt into one mortgage loan, obscuring the predictable fact that that the borrower will not be able to repay the new loan. The refinanced loans are themselves often refinanced repeatedly with ever-increasing fees and higher interest rates, and with ever-decreasing equity, as borrowers seek to stave off foreclosure.

      c.      Allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford.

      d.      Failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, reserves, and work history.  These criteria ensure that a borrower is obtaining a loan that he or she has the resources and assets to repay, and ignoring these criteria results in many loans that bear no relation to borrowers' ability to repay them.  This allows the lender to make a quick profit from the origination, but sets the borrower up for default and foreclosure.

      e.      Requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their subprime loan to a prime loan. Prepayment penalties not only preclude borrowers from refinancing to a more affordable loan, but reduce the borrowers' equity when a subprime lender convinces borrowers to needlessly refinance one subprime loan with another.

      f.      Charging excessive points and fees that are not associated with any increased benefits for the borrower.

27.      As long as housing prices continued to rise, the deleterious effect of these practices was delayed and thus, hidden.  When the real estate bubble burst earlier in 2007, the inevitable occurred, and foreclosure rates began their dramatic rise.  Bent on maximizing short-term profits and protected by the ability to sell their loans on the secondary market, irresponsible subprime lenders have left countless homeowners saddled with mortgage debts they cannot afford and no way to save their homes in a declining housing market.

**C.     The Foreclosure Crisis in Baltimore Hits African-American Neighborhoods the Hardest**

28.     In Baltimore, the impact of the foreclosure crisis is felt most acutely in minority communities.  This is because of the prevalence of the practice of "reverse redlining."  As used by Congress and the courts, the term "reverse redlining" refers to the practice of targeting residents in certain geographic areas for credit on unfair terms due to the racial or ethnic composition of the area.  In contrast to "redlining," which is the practice of denying *prime* credit to specific geographic areas because of the racial or ethnic composition of the area, reverse redlining involves the targeting of an area for the marketing of deceptive, predatory or otherwise deleterious lending practices because of the race or ethnicity of the area's residents.  This practice has repeatedly been held to violate the federal Fair Housing Act.  *See, e.g., Barkley v. Olympia Mortgage Co.*, 2007 WL 2437810 (E.D.N.Y. Aug. 22, 2007); *Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000).

29.     Reverse redlining typically flourishes in cities where two conditions are met.  First, the practice afflicts cities where minorities historically have been denied access to credit and other banking services.  The legacy of historic discrimination, or redlining, often leaves the residents of minority communities desperate for credit, and without the knowledge or experience required to identify loan products and lenders offering products with the most advantageous terms for which they might qualify.  Instead, residents of underserved minority communities often respond favorably to the first offer of credit made, without regard to the fairness of the product.  This makes them especially vulnerable to irresponsible subprime lenders who, instead of underwriting carefully to ensure that the loans they offer are appropriate for their customers, engage in the unscrupulous lending practices described in paragraph 26 above.

11

30.     Second, reverse redlining arises in cities where there are racially segregated residential living patterns.  This means that the people who are most vulnerable to abusive lending practices are geographically concentrated and therefore easily targeted by lenders.

31.     Both of these conditions are present in Baltimore.  First, Baltimore's minority communities historically have been victimized by traditional redlining practices. Through much of the twentieth century the federal government, mortgage lenders, and other private participants in the real estate industry acted to deny homeownership opportunities and choices to the City's African Americans.  The Secretary of the United States Department of Housing and Urban Development admitted in 1970 that the federal government had "refus[ed] to provide insurance in integrated neighborhoods, promot[ed] the use of racially restrictive covenants," and engaged in other methods of redlining. *Thompson v. U.S. H.U.D.*, 348 F. Supp. 2d 398, 466 (D. Md. 2005).  The federal government even published a map in 1937 titled "Residential Security Map for Baltimore" designed to facilitate private redlining by mortgage providers. *See id.* at 471. Mortgage lenders actively engaged in redlining for decades, treating "black and [the few] integrated neighborhoods as unstable and risky."  Garrett Power, *Apartheid Baltimore Style: The Residential Segregation Ordinances of 1910-1913*, 42 Md. L. Rev. 289, 319, 322 (1983).

32.     The practice and effects of widespread redlining in Baltimore persisted for decades.  An analysis of data from the 1980s, long after much of the institutionalized governmental and corporate apparatus of discrimination had been dismantled, found that the more African-American residents in a Baltimore neighborhood, the fewer mortgage loans and dollars the neighborhood received.  Anne B. Shlay, *Maintaining the Divided*

*City: Residential Lending Patterns in the Baltimore SMSA* (Maryland Alliance for Responsible Investment, March 1987).  The study also found that while 73% of majority white census tracts received a medium or high volume of single family mortgage loans, the same was true of only 5% of majority African-American tracts.

33.     Second, the City is highly segregated between African Americans and whites.  As the following map shows, even though Baltimore is 64% African-American and 32% white, many neighborhoods have a much higher concentration of one racial group or the other.  For example, the African-American population exceeds 90% in East Baltimore, Pimlico/Arlington/Hilltop, Dorchester/Ashburton, Southern Park Heights, Greater Rosemont, Sandtown-Winchester/Harlem Park, and Greater Govans.  It exceeds 75% in Waverly and Belair Edison.  At the same time, the white population of Greater Roland Park/Poplar, Medfield/Hampden/Woodberry, and South Baltimore exceeds 80%, and the white population of Cross-Country/Cheswolde, Mt. Washington/Coldspring, and North Baltimore/Guilford/Homeland exceeds 70%.



Percent of Owner Occupied Housing Units
that Are African American 2005

20% or Less
20.1% - 40%
40.1% - 60%
60.1% - 80%
Over 80%
Non Residential

Indicates Majority African-American Neighborhood

Indicates Majority White Neighborhood

34.    The location of foreclosures in the City of Baltimore is consistent with the existence of a pattern and practice of reverse redlining by lenders providing mortgages to residents of the City. As shown in the following map, although foreclosures have occurred in many parts of Baltimore, they are disproportionately concentrated in Baltimore's African-American neighborhoods. Neighborhoods like Greater Govans, Greater Rosemont, Madison/East End, and Southern Park Heights, all with African-American populations above 90%, are at the center of the foreclosure crisis. Citywide, census tracts that are above 80% African-American account for 49% of Baltimore's foreclosure filings, even though they account for only 37% of the City's owner-occupied households.



**D.    Wells Fargo is a Major Contributor to the Foreclosure Crisis in Baltimore's African-American Neighborhoods**

35.    Wells Fargo is one of the largest mortgage lenders in Baltimore.  It has made at least 1,285 mortgage loans in Baltimore in each of the last three years, with a collective value of over $600 million.  In each of these years, it has been one of the top two mortgage lenders in the City.  Wells Fargo makes loans in both the white and African-American neighborhoods of Baltimore.

36.    Far from being a responsible provider of much-needed credit in minority communities, however, Wells Fargo is one of the leading causes of the disproportionately high rate of foreclosures in Baltimore's African-American neighborhoods.  Its foreclosures since at least 2000 have been concentrated in Belair Edison, East Baltimore, Pimlico/Arlington/Hilltop, Dorchester/Ashburton, Southern Park Heights, Greater Rosemont, Sandtown-Winchester/Harlem Park, Greater Govans and Waverly, and other neighborhoods with African-American populations exceeding 75%.

37.    Half of Wells Fargo's foreclosures from 2005 to 2006 were in census tracts that are more than 80% African-American and two-thirds were in tracts that are over 60% African-American, but only 15.6% were in tracts that are 20% or less African-American.  The figures are virtually identical for Wells Fargo's foreclosures from 2000 to 2004 with more than half in tracts that are more than 80% African-American, 64% in tracts that are over 60% African-American, and only 14.8% in tracts that are 20% or less African-American.  Wells Fargo's foreclosures during the first half of 2007 reflect a similar pattern.  Almost half are in tracts that are more than 80% African-American, while only 11.4% are in tracts that are 20% or less African-American.

38.    At the same time, Wells Fargo has the largest number of foreclosures in Baltimore of any lender – at least 135 from 2005 to 2006.  Only two other lenders had

more than 100 foreclosures during this period.  With at least seventy foreclosures during the first half of 2007, the pace of Wells Fargo's foreclosures is increasing.  In addition, at least 108 Wells Fargo loans in Baltimore resulted in foreclosure from 2000 to 2004.  The number of Wells Fargo foreclosures from 2000 through the first half of 2007 is probably much higher because in many cases the foreclosure records analyzed by Plaintiff do not indicate the original lender.  The following map represents the concentration of Wells Fargo's foreclosures in African-American neighborhoods from 2000 through the first half of 2007.



Wells Fargo Foreclosures 1/1/2000 - 6/30/2007
• Property in Foreclosure
Percent of Owner Occupied Housing Units
that Are African American 2005
  20% or Less
  20.1% - 40%
  40.1% - 60%
  60.1% - 80%
  Over 80%
  Non Residential

Indicates Majority
African-American
Neighborhood

Indicates Majority
White Neighborhood

39.     The likelihood that a Wells Fargo loan in a predominantly (60% or greater) African-American neighborhood will result in foreclosure is significantly greater than the likelihood of foreclosure for a loan in a predominantly white neighborhood. While 8.2% of Wells Fargo's loans in predominantly African-American neighborhoods result in foreclosure, the same is true for only 2.1% of its loans in predominantly white neighborhoods. In other words, a Wells Fargo loan in a predominantly African-American neighborhood is nearly four times as likely to result in foreclosure as a Wells Fargo loan in a predominantly white neighborhood.

40.     The overall foreclosure rate in Baltimore, based on loans from all lenders, is 4.5%. Thus, Wells Fargo's foreclosure rate for loans in African-American neighborhoods is nearly double the overall City average, while the ratio for its loans in white neighborhoods is less than half the average.

E.     **Wells Fargo Targets Baltimore's African-American Neighborhoods for Improper and Irresponsible Lending Practices**

41.     Wells Fargo's failure to underwrite loans in minority and underserved communities in a responsible manner has been the subject of public attention and concern for years. For example, its practices are the focus of a 2004 report from the Center for Responsible Lending. The report concluded that the company's customers "too often face the loss of their home or financial ruin as a result" of its "predatory practices." Center for Responsible Lending, *A Review of Wells Fargo's Subprime Lending* (Apr. 2004) at 10 (available at http://www.responsiblelending.org/pdfs/ip004-Wells_Fargo-0404.pdf).

42.     Wells Fargo's pattern or practice of failing to follow responsible underwriting practices in Baltimore's African-American neighborhoods is evident from the type of loans that result in foreclosure filings in those neighborhoods. Approximately

70% of Wells Fargo's Baltimore loans that result in foreclosure are fixed rate loans. This ratio is the same in both African-American and white neighborhoods. This establishes that there is no legitimate reason for the stark difference in Wells Fargo's foreclosure rates by race.

43.     Unlike adjustable rate loans, where the price may fluctuate with changing market conditions, the performance of fixed rate loans is relatively easy to predict using automated underwriting models and loan performance data because monthly payments do not vary during the life of the loan. Using these sophisticated risk assessment tools, and relying on traditional underwriting criteria such as FICO scores, debt-to-income ratios, loan-to-value ratios, and cash reserves, any lender engaged in responsible underwriting practices designed to identify qualified borrowers can predict with statistical certainty the likelihood of default and/or delinquency. Lenders engaged in marketing fixed rate loans in a fair and responsible manner should have no difficulty sifting out unqualified borrowers, or borrowers whose loans would likely result in delinquency, default or foreclosure.

44.     Because the percentage of fixed rate loans is so high and the same in both African-American and white neighborhoods, Wells Fargo should, if it properly underwrites, have comparable foreclosure rates in both communities. The fact that Wells Fargo's underwriting decisions result in foreclosure nearly four times as often with respect to African-American than white neighborhoods means that it is not following fair or responsible underwriting practices with respect to African-American customers.

45.     The disparate foreclosure rates are instead consistent with the type of unscrupulous subprime lending practices described in paragraph 26 above. Upon information and belief, and as explained below, Wells Fargo engages in these and

similarly inappropriate practices when making loans to African Americans and in African-American neighborhoods. This pattern or practice of targeted activities fully explains the disparate rates of foreclosure.

46.     A closer look at the characteristics of the loans made by Wells Fargo in Baltimore demonstrates that it is engaged in a pattern or practice of reverse redlining with respect to the City's African-American neighborhoods. As described in sections E.1 through E.6 below, examination of Wells Fargo's loans indicates it is engaged in unfair and discriminatory practices in Baltimore's African-American neighborhoods that have the effect and purpose of placing inexperienced and underserved borrowers in loans they cannot afford. These practices maximize short-term profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods. This targeted pattern or practice has resulted in the disproportionately high rate of foreclosures found in Baltimore's African-American neighborhoods.

1.       **Publicly Available Home Mortgage Disclosure Act Data Shows that Wells Fargo's High-Cost Loans are Disproportionately Located in African-American Neighborhoods in Baltimore**

47.     Publicly available data reported by Wells Fargo to federal regulators pursuant to the Home Mortgage Disclosure Act shows that in 2006, Wells Fargo made high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark) to 65% of its African-American mortgage customers in Baltimore, but only to 15% of its white customers in Baltimore. In 2005, the respective rates were 54% and 14%; in 2004, the respective rates were 31% and 10%. The proportion of refinance loans that are high cost is especially pronounced. In 2004,

2005, and 2006, a Wells Fargo refinance loan to an African-American borrower was 2.5 times more likely to be high cost than a refinance loan to a white borrower.

48.     The maps that follow show the geographic distribution of high-cost loans in African-American and white neighborhoods in Baltimore.  These maps demonstrate that Wells Fargo's high-cost loans are disproportionately located in Baltimore's African-American neighborhoods, including, among others, Sandtown-Winchester/Harlem Park, Upton/Druid Heights, Dorchester/Ashburton, and Madison/East End.



North
Greater Roland Park/Poplar
Mt. Washington/Coldspring
Cross-Country/Cheswolde
Medfield/Hampden/Woodberry
Greater Govans
Waverly
Belair Edison
Pimlico/Arlington/Hilltop
Southern Park Heights
Dorchester/Ashburton
Greater Rosemont
Clifton-Berea
Madison/East End
Upton/Druid Heights
Sandtown-Winchester/Harlem Park
South Baltimore

Wells Fargo High Cost Purchase and
Refinance Loan Originations 2004-2006
    1 Dot = 1 Loan Originated, Not Actual Address
    High Rate Spread, Over 300 bp
Percent of Owner Occupied Housing Units
that Are African American 2005
    20% or Less
    20.1% – 40%
    40.1% – 60%
    60.1% – 80%
    Over 80%
    Non Residential

Indicates Majority
African-American
Neighborhood

Indicates Majority
White Neighborhood

24



49.     The fact that high-cost loans involving all of Wells Fargo's loan products are more heavily concentrated in Baltimore's African-American neighborhoods is consistent with the practice of reverse redlining and, upon information and belief, has contributed significantly to the disproportionately high rate of foreclosures in Baltimore's African-American communities.  Within the subset of high-cost loans, however, the fact that a disproportionately large percentage of Wells Fargo's high-cost loans in African-American neighborhoods are refinance loans is particularly significant, for it is both consistent with and indicative of a deceptive and predatory subprime practice that involves encouraging minority borrowers who already have loans to refinance at excessive cost with little benefit.  This increases the likelihood of foreclosure and, upon information and belief, has contributed to the disproportionately high rate of foreclosures in Baltimore's African-American communities.

**2.     Wells Fargo's Pricing Sheets Show that it Targets Homes that are More Likely to be Located in African-American Neighborhoods for Interest Rate Increases, and Lowers Rates for Homes that are Disproportionately Located in White Neighborhoods**

50.     One reason that residents of Baltimore's African-American neighborhoods are more likely to pay higher prices for Wells Fargo loans than residents of Baltimore's white neighborhoods is the discriminatory pricing found on its pricing sheets.  As set forth explicitly on the Wells Fargo Home Mortgage 2005 pricing sheet, attached as Attachment A, Wells Fargo requires a 50 basis point <u>increase</u> in the loan rate for loans of $75,000 or less, a 12.5 basis point <u>decrease</u> for loans of $150,000 to $400,000, and a 25 basis point <u>decrease</u> for loans larger than $400,000.  This means that a borrower with a $75,000 thirty-year fixed rate loan who qualifies for an 8% interest rate instead receives an 8.5% interest rate, which costs an extra $9,493 over the life of the loan.  An equally creditworthy borrower with a $150,000 loan receives a 7.875% interest rate, which costs

$4,698 less than an 8% loan.  A similarly qualified borrower with a $400,001 loan would receive a 7.75% interest rate, which costs $24,987 less than an 8% loan.

51.     These pricing rules have a clear and foreseeable disproportionate adverse impact on African-American borrowers.  As demonstrated by the maps that follow, loans originated by Wells Fargo in Baltimore from 2004 through 2006 in the amount of $75,000 and less were nearly twice as likely to be in census tracts where the population is predominantly African-American than in tracts where the population is predominantly white.  By contrast, loans originated by Wells Fargo in Baltimore of more than $150,000 were nearly six times as likely to be in tracts that are predominantly white than in tracts that are predominantly African-American.





52.     Upon information and belief, the discriminatory pricing reflected in Wells Fargo's pricing sheets is consistent with unfair practices associated with reverse redlining and has contributed significantly to the disproportionately large number of foreclosures found in Baltimore's African-American communities.

3.     **Investigation of Wells Fargo's Pricing Practices in Philadelphia Further Demonstrates the Company is Targeting the African-American Community for Unfair and Improper Lending Practices**

53.     Discriminatory pricing observed in Wells Fargo's loan data in Baltimore is consistent with findings drawn from data obtained in litigation brought against Wells Fargo in Philadelphia.  An expert report in a pending lawsuit based on Wells Fargo's Philadelphia loans concluded that "African American borrowers, and borrowers residing in African American neighborhoods (i.e., census tracts), pay more than comparable non-African Americans and residents of communities in which White people predominate." Aff. of I. Goldstein, *Walker v. Wells Fargo Bank, N.A.*, No. 05-cv-6666 (E.D. Pa. July 20, 2007) at ¶ 7 (Docket No. 24, Attach. 1).

54.     Upon information and belief, Wells Fargo's pricing practices in Philadelphia are consistent with its practices in Baltimore, and provide further evidence that the company is engaged in a pattern or practice of unfair lending that contributes significantly to the disproportionately high rate of foreclosure found in Baltimore's African-American neighborhoods.

4.     **Wells Fargo Underwrites Adjustable Rate Loans in Baltimore's African-American Neighborhoods That Borrowers Cannot Afford**

55.     Wells Fargo frequently originates, or until earlier in 2007originated, "2/28" and "3/27" adjustable rate mortgages to borrowers from predominantly African-American neighborhoods in Baltimore.  Thirty percent of Wells Fargo's foreclosures

from 2000 to 2006 involved such loans.  Unless properly underwritten, such loans are destined to fail.

56.    Upon information and belief, Wells Fargo does not properly underwrite these loans when made to African Americans and in African-American neighborhoods. Wells Fargo does not adequately consider the borrowers' ability to repay these loans, especially after the teaser rate expires and the interest rate increases.  The fact that these loans would result in delinquency, default and foreclosure for many borrowers was, or should have been, clearly foreseeable to Wells Fargo at the time the loans were made.

57.    The use of "2/28" and "3/27" adjustable rate mortgages in the manner described above is consistent with the practice of reverse redlining, has subjected African-American borrowers to unfair and deceptive loan terms, and has contributed significantly to the high rate of foreclosure found in Baltimore's African-American neighborhoods.

**5.    The Caps on Wells Fargo's Adjustable Rate Loans are Higher in African-American Neighborhoods**

58.    Upon information and belief, Wells Fargo has discretion to apply different caps on adjustable rate loans.  The cap is the maximum rate that a borrower can be charged during the life of an adjustable rate loan.

59.    The average cap on a Wells Fargo adjustable rate loan that was subject to foreclosure in 2005 or 2006 in predominantly African-American neighborhoods was 14.13%.  The cap on such loans in predominantly white neighborhoods was only 13.61%.

60.    The disparity observed in caps imposed on adjustable rate loans in predominantly African-American neighborhoods and predominantly white neighborhoods further demonstrates that Well Fargo is engaged in a pattern or practice of

31

unfair and improper lending in Baltimore's African-American communities that
contributes significantly to the high rate of foreclosure in these neighborhoods.

> **6.    Wells Fargo's Loans in African-American Neighborhoods Result in
> Especially Quick Foreclosures**

61.     A comparison of the time from origination to foreclosure of Wells Fargo's
loans in Baltimore shows a marked disparity with respect to the speed with which loans
in African-American and white neighborhoods move into foreclosure.  In African-
American neighborhoods, the average time to foreclosure is 2.06 years.  In white
neighborhoods it is 2.45 years, or 19% longer.

62.     This disparity in time to foreclosure is further evidence that Wells Fargo is
engaged in lending practices consistent with reverse redlining.  As with all of the
practices identified in paragraphs 47-60 above, and like the abusive practices identified in
paragraph 26 above, the disparity in time to foreclosure demonstrates that Wells Fargo is
engaged in irresponsible underwriting in African-American communities that does not
serve the best interests of borrowers.  If Wells Fargo were applying the same
underwriting practices in Baltimore's African-American and white neighborhoods, there
would not be a significant difference in time to foreclosure.  Were Wells Fargo
underwriting borrowers in both communities with equal care and attention to proper
underwriting practices, borrowers in African-American communities would not find
themselves in financial straits significantly sooner during the life of their loans than
borrowers in white communities.  The faster time to foreclosure in African-American
neighborhoods is consistent with underwriting practices in the African-American
community that are less concerned with determining a borrower's ability to pay and
qualifications for the loan than they are in maximizing short-term profit.

63.    This difference in time to foreclosure is especially important because foreclosures occur more quickly in Baltimore than in neighboring jurisdictions.  For all lenders, the average time from loan origination to foreclosure in Baltimore is three years, while in Philadelphia it is four years and in New Castle County, Delaware (which includes Wilmington) it is 4.3 years.  This means that the injuries that result from foreclosures in Baltimore are compounded, and therefore grow, at a faster pace.

## INJURY TO BALTIMORE CAUSED BY
## WELLS FARGO'S DISCRIMINATION IN MORTGAGE LENDING

64.    Wells Fargo has engaged in a pattern or practice of reverse redlining that has resulted in a disproportionately high rate of foreclosure on loans to African Americans and in Baltimore's majority African-American neighborhoods.  Wells Fargo continues to engage in this discriminatory pattern or practice with similar and continuing deleterious consequences for Baltimore's African-American neighborhoods.

65.    The foreclosures caused by Defendants' discriminatory lending practices are particularly injurious because they are concentrated in distressed and transitional neighborhoods, as reflected on the following map.  These neighborhoods include, among others, Greater Rosemont, Upton/Druid Heights, Clifton-Berea, and Madison/East End, all with African-American populations over 90%.  These neighborhoods have high vacancy rates, low rates of owner occupancy, substantial housing code violations, and low property values.  These characteristics make these neighborhoods most vulnerable to the deleterious effects of foreclosures.



North
Baltimore/Guilford/Homeland
Greater Roland Park/Poplar
Mt. Washington/Coldspring
Cross-Country/Cheswolde
Medfield/
Hampden/
Woodberry
Greater Govans
Waverly
Belair Edison
Pimlico/Arlington/Hilltop
Southern Park Heights
Dorchester/Ashburton
Clifton-Berea
Madison/East End
Greater Rosemont
Upton/Druid Heights
Sandtown-
Winchester/Harlem Park
South Baltimore

Wells Fargo Foreclosures 1/1/2000 - 6/30/2007
• Property in Foreclosure
Baltimore Market Value Analysis 2006
  Competitive
  Competitive
  Emerging
  Stable
  Transitional
  Distressed
  Distressed
  Downtown MultiFamily
  Outer City MultiFamily
  Non-Residential

Indicates Majority
African-American
Neighborhood

Indicates Majority
White Neighborhood

66.     The foreclosures caused by Defendants' discriminatory reverse redlining practices have caused, and continue to cause, multiple types of injuries to Baltimore, including:

        a.     A significant decline in the value of nearby homes, resulting in a decrease in property tax revenue;

        b.     An increase in the number of abandoned and vacant homes;

        c.     An increase in criminal and gang activity as abandoned and vacant homes become centers for squatting, drug use, drug distribution, prostitution, and other unlawful activities;

        d.     Increased expenditures for police and fire protection;

        e.     Increased expenditures to secure abandoned and vacant homes;

        f.     Additional expenditures to acquire and rehabilitate vacant properties; and

        g.     Additional expenditures for administrative, legal, and social services.

67.     Damages suffered by the City of Baltimore as a result of Wells Fargo's foreclosures are fully capable of empirical quantification.  Recent studies demonstrate that the precise financial impacts of the different types of injuries caused by foreclosures are quantifiable.  A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1% in the value of each single-family home within a quarter of a mile. *See* D. Immergluck & G. Smith, *The External Costs of Foreclosure:  The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 Housing Policy Debate 57 (2006).

68.    Other studies have focused on the impact of abandoned homes on surrounding property values.  A recent study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.  Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, at 20 (2004).

69.    The costs of increased municipal services that are necessary because of foreclosures have also been analyzed empirically.  A study commissioned by the Homeownership Preservation Foundation isolated twenty-six types of costs incurred by fifteen government agencies in response to foreclosures in Chicago.  *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures: A Chicago Case Study* (Feb. 27, 2005) at 24-26 (available at http://www.nw.org/network/neighborworksProgs/ foreclosuresolutions/documents/2005Apgar-DudaStudy-FullVersion.pdf).  It then analyzed the amount of each cost based on different foreclosure scenarios, such as whether the home is left vacant, whether and to what degree criminal activity ensues, and whether the home must be demolished.  The study found that the total costs ran as high as $34,199 per foreclosure.

70.    The damages and costs to Baltimore of the foreclosures caused by Defendants' discriminatory lending practices, including but not limited to those described above, are in the tens of millions of dollars.

71.    Defendants' actions set forth herein constitute a pattern or practice of discriminatory lending and a continuing violation of federal law.  Unless enjoined, Wells Fargo will continue to engage in the unlawful pattern or practice described above.

72.     Baltimore has been, and continues to be, adversely affected by the acts, policies, and practices of Defendants, their employees, and/or their agents.

73.     The extent of Baltimore's injuries will increase unless and until Wells Fargo ceases to discriminate against African Americans and borrowers in majority African-American neighborhoods.

74.     Defendants' unlawful actions described above were, and are, intentional and willful, and/or have been, and are, implemented with callous and reckless disregard for Baltimore's federally protected rights.

## CAUSE OF ACTION
(Federal Fair Housing Act)

75.     Plaintiff repeats and incorporates by reference all allegations contained in Paragraphs 1 through 74 as if fully set forth herein.

76.     Defendants' acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604 and 3605:

(a)     Defendants' acts, policies, and practices have made and continue to make housing unavailable on the basis of race and/or color, in violation of 42 U.S.C. § 3604(a);

(b)     Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race, and/or color, in violation of 42 U.S.C. § 3604(b);

(c)     Defendants' published policies and statements have expressed and continue to express a preference on the basis of race and/or color, in violation of 42 U.S.C. § 3604(c); and

(d)     Defendants' acts, policies, and practices have provided and
continue to provide different terms, conditions and privileges on the basis of race
and/or color in connection with the making of residential real estate-related
transactions, in violation of 42 U.S.C. § 3605.

## DEMAND FOR JURY TRIAL

77.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all
issues triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant it the following
relief:

(1)     enter a declaratory judgment that the foregoing acts, policies, and practices
of Defendants violate 42 U.S.C. §§ 3604 and 3605;

(2)     enter a permanent injunction enjoining Defendants and their directors,
officers, agents and employees from continuing to publish, implement, and enforce the
illegal, discriminatory conduct described herein and directing Defendants and their
directors, officers, agents and employees to take all affirmative steps necessary to remedy
the effects of the illegal, discriminatory conduct described herein and to prevent
additional instances of such conduct or similar conduct from occurring in the future;

(3)     award compensatory damages to Plaintiff in an amount to be determined
by the jury that would fully compensate Plaintiff for its injuries caused by the conduct of
Defendants alleged herein;

(4)     award punitive damages to Plaintiff in an amount to be determined by the
jury that would punish Defendants for the willful, wanton and reckless conduct alleged
herein and that would effectively deter similar conduct in the future;

(5)     award Plaintiff its reasonable attorneys' fees and costs pursuant to 42

U.S.C. § 3613(c)(2); and

(6)     order such other relief as this Court deems just and equitable.


January 8, 2008

_____
John P. Relman,
    MD Fed. Bar No. 11482
Bradley H. Blower
    MD Fed. Bar No. 07641
Glenn Schlactus
    Pending Admission *Pro Hac Vice*
RELMAN & DANE, PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888
(202) 728-0848 (fax)
jrelman@relmanlaw.com
bblower@relmanlaw.com
gschlactus@relmanlaw.com

*Special Assistant City Solicitors and*
*Attorneys for Plaintiff*

George Nilson, City Solicitor, MD Fed. Bar No. 01123
Suzanne Sangree, Chief Solicitor, MD Fed. Bar No. 26130
City Hall
100 N. Holliday Street
Baltimore, Maryland 21202
(410) 396-3297
(410) 659-4077 (fax)
George.Nilson@baltimorecity.gov
Suzanne.Sangree@baltimorecity.gov

*Attorneys for Plaintiff*