IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAYOR AND CITY COUNCIL OF BALTIMORE,
Plaintiff,

                                                    Civil No. JFM 1:08 CV-00062

v.

WELLS FARGO BANK, N.A.
and
WELLS FARGO FINANCIAL LEASING, INC.,
Defendants.


OPINION


The Mayor and City Council of Baltimore ("the City") has brought this action against Wells Fargo Bank, N.A. and Wells Fargo Financial Leasing, Inc. ("Wells Fargo") under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.*, alleging that Wells Fargo's predatory and discriminatory lending practices have led to foreclosures that harm the City.  Wells Fargo has filed a Motion to Dismiss an Amended Complaint filed by the City.  The Motion to Dismiss will be granted, with leave for the City to file a Second Amended Complaint asserting narrower claims if it chooses to do so.

I.

A.

The City filed its initial Complaint on January 8, 2008.  On March 21, 2008, Wells Fargo filed a Motion to Dismiss, challenging the City's standing and contending that the complaint failed to state a cognizable FHA violation under either a disparate treatment or disparate impact theory.  On June 1, 2009, the City filed a Motion to File an Amended Complaint with exhibits.  Chief Judge Legg then held a hearing on the initial Complaint, denied the Motion to Dismiss, and granted the City leave to file an amended complaint. *Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A., et al.*, 631 F. Supp. 702, 703-04 (D. Md. July 2, 2009).  At that time Chief Judge Legg found it "appropriate to permit discovery and to revisit the standing

questions later at the summary judgment stage." *Id.* at 704.  Discovery was also to include a

statement from Wells Fargo about "when, and in what manner, it plans to respond" to the

Amended Complaint.  *Id.* at  704 n.2.  On August 6, 2009, the case was reassigned to me, and on

the same day I held a hearing on various pending matters.  Wells Fargo subsequently filed its

Motion to Dismiss the Amended Complaint.[1]  A hearing on that motion was held on December

14, 2009.

B.

Only a very limited recitation of facts, as alleged in the Amended Complaint, is necessary

for the purpose of deciding the present motion.  The City asserts that Wells Fargo engaged in

the practice of reverse redlining, targeting the City's underserved and vulnerable minority

neighborhoods.  These lending practices allegedly have led to a disproportionately high rate of

foreclosure in the City's African-American communities, causing an increase in abandoned and

vacant homes in those areas, which in turn has allegedly caused financial harm to the City. (Am.

Compl. at 1-3.)  Specifically, the City argues that foreclosures have caused:

    a.  A significant decline in the value of nearby homes, resulting in a decrease in property tax revenue;
    b.  An increase in the number of abandoned and vacant homes;
    c.  An increase in criminal and gang activity as abandoned and vacant homes become centers for squatting, drug use, drug distribution, prostitution, and other unlawful activities;
    d.  Increased expenditures for police and fire protection;

---

[1] The City argues that Wells Fargo should not be able to file this Motion to Dismiss because it is essentially a motion for reconsideration, which would render it untimely and inappropriate. (City's Memo. in Opp. at 2.)  This argument is without merit.  The City's decision to file an Amended Complaint permits Wells Fargo to file a second Motion to Dismiss.  This should not be surprising to the City because, as the City acknowledges, Judge Legg told Wells Fargo it could file a Motion to Dismiss the Amended Complaint if its initial Motion to Dismiss was denied after the hearing he held. (*Id.* at 11.)

       I also note that although I disagree with Judge Legg about whether the City's claims should be dismissed, I very much respect the thoughtful process he put in place to test the viability of the City's claims.  Indeed, at the August 6 hearing I indicated my approval of the process.  It was only after I had considered the memoranda filed in connection with Wells Fargo's Motion to Dismiss the Amended Complaint that I began to question whether the claims asserted by the City were plausible and sufficient to withstand dismissal.  For this reason, at the December 14 hearing I expressed (more tartly than I would have liked) my desire that counsel focus upon the issues as presently framed rather than allude to the procedural history of the case.

e.   Increased expenditures to secure abandoned and vacant homes;
f.   Additional expenditures to acquire and rehabilitate vacant properties; and
g.   Additional expenditures for administrative, legal, and social services.

(*Id.* at 50.)

II.

As the Supreme Court has explained, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.  This inquiry involves both constitutional and prudential limitations on its exercise."  *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979).  Because standing under the FHA is "as broad as is permitted by Article III of the Constitution," the constitutional and prudential limitations merge in a case brought under the FHA.  *See id.* at 108 (citation and internal quotation omitted).  Accordingly, here I need only evaluate whether the City meets the constitutional requirements for standing.  The plaintiff bears the burden of establishing that it has standing by proving that "(1) the plaintiff suffered an injury in fact . . . that is concrete and particularized, and actual or imminent . . . ; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision of the court."  *South Carolina Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 329 (4th Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

An attenuated causal connection is insufficient; the injuries "must be fairly traceable to the actions of the Defendants, rather than the result of actions by some independent third party not before the court."  *Dixon v. Edwards*, 290 F.3d 699, 711 (4th Cir. 2002) (citations omitted); *see also Migrant Potomac River, LLC v. United States Envtl. Prot. Agency*, 577 F.3d 223, 226 (4th Cir. 2009) (citing *Frank Krasner Enters. Ltd. v. Montgomery County*, 401 F.3d 230, 234-35 (4th Cir. 2005)).  When claimed injuries are "highly indirect" and result from "the independent action of some third party not before the court," too much speculation is required to connect the links in the chain of causation.  *See Allen v. Wright*, 468 U.S. 737, 757-59 (1984); *see also Frank Krasner*, 401 F.3d at 235 (finding no standing where a third party "stands directly between the plaintiffs and the challenged conduct in a way that breaks the causal chain").  Further, as the Supreme Court has recently held, the allegations made in a complaint must

3

assert a "plausible" claim against a defendant.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)
(citing *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 570 (2007)).  Presumably, this rule applies
to allegations about standing.  In any event, the concept of "plausibility" is inherent in the
concept of "fair traceability" that underlines the standing requirement.  *See Gladstone*, 441 U.S.
at 110-11 (finding that "although the complaints are more conclusory and abbreviated than
good pleading would suggest," plaintiffs did allege sufficient facts from which it could be
inferred that the defendants' racial steering activities in particular neighborhoods resulted in a
diminishing tax base and "other harms [that] are not unlikely.")

In the present case, the City's allegations in the Amended Complaint of a causal
connection between Wells Fargo's alleged misconduct and the damages the City claims is not
plausible.  According to the Amended Complaint, "[s]ince 2000, more than 33,000 homes have
been subjected to foreclosure filings . . . [and the] foreclosure crisis has caused severe
economic damage to the City." (Am. Comp. at  1.)  Moreover, according to the Amended
Complaint, "[e]stimates of the number of vacant homes in Baltimore range from 16,000 to
30,000." (Am. Compl. at 18.)  No allegation is made in the Amended Complaint as to how many
of these vacancies have been caused by foreclosures of properties on which Wells Fargo made
reverse redlined loans.  However, in subsequent briefing the City has identified only 401
properties on which Wells Fargo made loans that were foreclosed upon between 2005 and
2008, 163 of which were located in African-American neighborhoods and became vacant after
the Wells Fargo loans were initiated.  (Plaintiff's Memorandum in Opposition at 6.)  According
to the City's own assertion, only eighty of these properties are now vacant.

Thus, using the City's own figures, Wells Fargo is responsible for only a negligible portion
of the City's vacant housing stock.  This fact alone demonstrates the implausibility of any
alleged causal connection between Wells Fargo's alleged reverse redlining activities and the
generalized type of damages claimed by the City, e.g., decline in value of homes and decreased
property tax revenues resulting, increased criminal and gang activities, and increased police and
fire protection resulting from building vacancies.  Moreover, the alleged connection is even
more implausible when considered against the background of other factors leading to the

deterioration of the inner city, such as extensive unemployment, lack of educational opportunity and choice, irresponsible parenting, disrespect for the law, widespread drug use, and violence.[2] *Cf. City of Birmingham v. Citigroup, Inc.*, No. CV-09-BE-467-S, *8 (N.D. Ala. Aug. 19, 2009) ("[T]he minority borrowers in this case could have defaulted on their mortgages for a number of reasons, none of which related to the Defendants' alleged 'reverse redlining.'"). It may be entirely reasonable to posit—as the City's allegations amply support—that unscrupulous lenders took advantage of inner city residents living in a dysfunctional environment to induce them to make loans they could not afford. It does not follow, however, that it is reasonable to infer—as the City argues—that the unscrupulous lenders themselves created the dysfunctional environment they exploited.

I recognize that the City has retained experts who are prepared to opine that incremental damages caused by a lender who causes incremental damage to a community can be reasonably calculated and attributed to the lender. By ruling, as I am, that this opinion is not sufficient to withstand a motion to dismiss, I am questioning neither the qualifications nor the methodology of the City's experts. However, a court is a forum in which facts and theory must converge. There are occasions in which concrete facts are themselves dull and unenlightening, and their significance can be explained only through the testimony of persons who are trained to see their meaning. It is for such occasions that Federal Rule of Evidence 702 is designed, permitting the introduction of opinions about "scientific, technical, or other specialized knowledge" if the opinions "will assist the trier of fact to understand the evidence." But however academically acceptable an expert's opinion might be, in order to be admissible as evidence, it must bear—from the perspective of judges, not only fellow experts—a coherent relationship to the underlying facts. This is the origin and reason for the requirement of a claim's plausibility that for almost twenty-five years has been a settled part of summary judgment law, *see Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1985) and

---

[2] The City's claims here are all the more implausible because, as the allegations in the Amended Complaint make clear, the severe problems faced by the inner city preexisted the making of Wells Fargo's loans. That is not to say, however, that improper lending activities are actionable only where loans are made in stable communities. Conceivably, there might be situations in which a significant amount of improper lending activity in a particular neighborhood caused then ongoing rehabilitation efforts by other home owners in that neighborhood to fail or caused a deteriorating neighborhood to become dramatically worse.

that, at least since the decisions in *Iqbal* and *Twombley*, is part of dismissal law as well.  To disregard that requirement at the outset of litigation may result in the parties incurring substantial fees, costs, and other expenses that are improvident and unnecessary.

For these reasons, Wells Fargo's Motion to Dismiss the Amended Complaint is granted. If the City desires to pursue a more limited claim, such as a claim for specific damages allegedly suffered by the City in regard to specific houses that became vacant allegedly because of Wells Fargo's  lending activities or a claim for damages allegedly caused to a specific neighborhood in which Wells Fargo made enough allegedly improper loans that its activities bear a plausible causal relationship to the destruction of that neighborhood, it may file a second amended complaint on or before February 3, 2010.  If, on the other hand, the City desires to continue to pursue the more generalized claims asserted in the Amended Complaint, it should appeal my ruling to the Fourth Circuit.[3]


DATE:  <u>1/6/2010</u>                        <u>  /s/                    </u>
                                         J. Frederick Motz
                                         United States District Judge

---

[3] If the City decides before February 3, 2010, that it does not want to pursue a more limited claim but instead to appeal my ruling, it should so notify me and opposing counsel as soon as the decision is made, and I will immediately enter a final order of dismissal so that no delay will be encountered in the appeal process.