UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

_____
                                    )
**MAYOR AND CITY COUNCIL**          )
**OF BALTIMORE,**                   )
                                    )
                                    )
                 Plaintiff,         )
                                    )
          v.                        )   Case No. 1:08-cv-00062-JFM
                                    )
**WELLS FARGO BANK, N.A.**          )
                                    )
          and                       )
                                    )
**WELLS FARGO FINANCIAL**           )
**LEASING, INC.,**                  )
                                    )
                 Defendants.        )
_____)


**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR
RECONSIDERATION OF RULING ON DISCOVERY PLAN**

Baltimore's Motion for Reconsideration makes two central points: *First*, causation for the overwhelming majority of Wells Fargo foreclosure properties cannot be determined without a comparative file review. This is clear from the testimony of Wells Fargo's own expert, David Williams, who concluded that in at least 100 of 143 foreclosure files he looked at, "excessive obligation" was a "contributing factor" to the borrower's inability to pay and the foreclosure. Without knowing whether and how much of the "excessive obligation" at each property was due to discrimination by Wells Fargo, it will be impossible to know whether or not Wells Fargo is liable for causing the foreclosure. That, in turn, can only be calculated by seeing how similarly-situated white borrowers were treated.

Case 1:08-cv-00062-JFM   Document 213   Filed 08/30/11   Page 2 of 14

*Second*, this problem cannot be resolved by pricing sheets because Wells Fargo employees were not bound by the pricing sheets. They had discretion to charge far less (in the case of whites) or far more (in the case of African Americans) than what was listed on the sheets. *See, e.g.*, Decl. of E. Jacobson ¶¶ 13, 22, 24 (Docket No. 176-1) (Oct. 21, 2010). What matters is not what the pricing sheets say, but what price Wells Fargo actually charged and the points and fees it actually required borrowers to pay at closing. That can only be determined by seeing how both whites and African Americans were treated.

Nowhere in its opposition brief does Wells Fargo address either of these two critical points. Wells Fargo is silent for good reason: to respond would require impeaching the testimony and report of its own "expert" witness. Williams' report establishes that separating the role of "excessive obligation" from any other contributing factor will be essential to determining causation in the overwhelming number of Wells Fargo properties at issue in this case, and *Wells Fargo does not dispute this*.

The City agrees with the Court that it makes sense to determine causation at the outset, but it should be done in a way that yields a meaningful result. Williams identified events like a divorce or the loss of a job in only 11% and 29%, respectively, of the 143 files he reviewed. And even where such events occur, whether they have dire or only short term and modest financial implications varies in every case. Williams also concluded that multiple factors contributed to all or nearly all of the defaults. All of this means that looking only at non-loan factors like divorces and lost jobs will not be sufficient to assess the causation question the Court seeks to resolve. A comparative file review must also be conducted to permit a full understanding of the interplay of the various factors that contributed to a default. Without a comparative file review, the parties and the Court will be left to speculate about what a borrower

*Second*, this problem cannot be resolved by pricing sheets because Wells Fargo employees were not bound by the pricing sheets. They had discretion to charge far less (in the case of whites) or far more (in the case of African Americans) than what was listed on the sheets. *See, e.g.*, Decl. of E. Jacobson ¶¶ 13, 22, 24 (Docket No. 176-1) (Oct. 21, 2010). What matters is not what the pricing sheets say, but what price Wells Fargo actually charged and the points and fees it actually required borrowers to pay at closing. That can only be determined by seeing how both whites and African Americans were treated.

Nowhere in its opposition brief does Wells Fargo address either of these two critical points. Wells Fargo is silent for good reason: to respond would require impeaching the testimony and report of its own "expert" witness. Williams' report establishes that separating the role of "excessive obligation" from any other contributing factor will be essential to determining causation in the overwhelming number of Wells Fargo properties at issue in this case, and *Wells Fargo does not dispute this*.

The City agrees with the Court that it makes sense to determine causation at the outset, but it should be done in a way that yields a meaningful result. Williams identified events like a divorce or the loss of a job in only 11% and 29%, respectively, of the 143 files he reviewed. And even where such events occur, whether they have dire or only short term and modest financial implications varies in every case. Williams also concluded that multiple factors contributed to all or nearly all of the defaults. All of this means that looking only at non-loan factors like divorces and lost jobs will not be sufficient to assess the causation question the Court seeks to resolve. A comparative file review must also be conducted to permit a full understanding of the interplay of the various factors that contributed to a default. Without a comparative file review, the parties and the Court will be left to speculate about what a borrower

would have paid for a loan absent discrimination.  Between discovery, briefing and adjudication, considerable time will be lost and the issue of causation will remain unresolved.  As the Court noted in an earlier hearing:  "And if that [excessive obligation as a reason] came out on summary judgment I'd say – if that's what their summary judgment was on, subject to hearing reply, I'd deny the summary judgment."  Tr. (Aug. 6, 2009) at 49.

Rather than address this central issue of causation, the core of Wells Fargo's brief is a lengthy discussion of the use of statistics in class action discrimination cases and the requirements of a *prima facie* case.  These arguments are irrelevant to the issue at hand and wrong as a matter of law.  Wells Fargo is simply incorrect that, apart from class actions, individuals alleging discrimination may not develop statistical evidence about broader discrimination.  Indeed, after arguing for four pages that statistical information has no role in a suit brought by an individual, Wells Fargo eventually concedes that it does.  Defs.' Opp. to Mot. For Reconsideration of Ruling on Discovery Plan (Docket No. 211) (Aug. 26, 2011) ("Opp.") at 9. Even Wells Fargo's own cases require this concession by stating explicitly that statistics showing systemic discrimination are relevant to and support individual discrimination claims. *See, e.g.*, *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 n.3 (4th Cir. 2004), *cited in* Opp. at 6.  Moreover, this case is about the harm caused to Baltimore by systemic discrimination against the residents of its African-American neighborhoods collectively, not discrimination against an individual.

Wells Fargo is also wrong about why Baltimore seeks reconsideration and discovery of comparative loan information.  Baltimore seeks this information because assessing causation requires the use of statistical information to calculate the precise cost of discrimination at each property, not because the City disagrees with assessing causation at the outset.  Wells Fargo

likewise errs by asserting that a statistical analysis will yield only an average cost of discrimination that the City seeks to apply across the board.  To the contrary, it will yield a property-specific answer that accounts for the unique circumstances of each loan.  Producing the information required for this analysis will not be burdensome because it can be done in electronic format, and more importantly, there is good reason to believe that Wells Fargo has already organized and packaged this information for regulatory purposes.  If Wells Fargo continues to assert that compiling the data is burdensome, it should be required to report to the Court what loan information it has already compiled for any purpose.

Wells Fargo also misrepresents what it is asking the Court to do in its opposition, which is much more than to simply deny the motion.  Wells Fargo wants the Court to go well beyond its August 10, 2011 ruling by ordering Baltimore to produce numerous categories of documents that have no bearing on why any particular borrower defaulted.  Wells Fargo made the same request in its discovery plan submissions before the hearing, but the Court explicitly declined to do so and directed the parties to try to negotiate a resolution of narrow document issues without judicial involvement. Tr. (Aug. 10, 2011) at 12 ("you [should] all talk about focusing upon causation discovery").  Unless it had timely and successfully moved for reconsideration itself, Wells Fargo was obligated to respect the Court's decision.

Finally, Wells Fargo's request for fees and costs is baseless.  The City's motion for consideration is proper, well supported, and timely; the City was not required to meet and confer with Wells Fargo about how to implement the August 10, 2011 ruling before seeking reconsideration of that ruling; and the only way resources would have been wasted would have been if the parties had engaged in a meet and confer even though a motion for reconsideration was forthcoming.  Discovery has not yet started, and Wells Fargo cannot claim to have incurred

any fees or costs as a result of any actions by the City in that regard or as a result of this timely request for reconsideration. Wells Fargo's request for fees and costs is also based on an inaccurate description of a telephone call between counsel.

### A.   Wells Fargo Fails to Address Baltimore's Central Argument

Baltimore explained in its opening brief that Wells Fargo's own expert report from 2009, which was not addressed at the August 10, 2011 hearing on the discovery plan, shows that the question of what caused each loan to go into default cannot be answered without first identifying the precise monthly cost to the borrower of Wells Fargo's discrimination. The expert, David Williams, addressed the very issue of what caused the defaults and found that "excessive obligation" was the main reason, not events like a divorce or the loss of a job. This directly implicates the Wells Fargo loans because the City alleges that reverse redlining by Wells Fargo made loans more expensive than they should have been and caused loans to be made that should not have been. Williams' report means that whether a discriminatory loan contributed to and was therefore a legal cause of a default cannot be answered for any appreciable number of properties (if any at all) if the parties and the Court are left to speculate about the added monthly cost attributable to discrimination and about whether the loan would have been made in the first place absent discrimination. Pl.'s Mot. for Reconsideration (Docket No. 210) (Aug. 24, 2011) ("Mot.") at 2-3, 6-10.

Wells Fargo does not dispute any of this. Wells Fargo's silence about the Williams report and its implications for discovery and summary judgment about causation amounts to an admission that the points Baltimore has drawn from the Williams' analysis, as it affects the causation inquiry, are correct.

B.   **Wells Fargo Admits That Under the Current Discovery Plan, the Parties and the Court Will Have to Speculate About the Financial Cost of Discrimination to Any Particular Borrower**

Baltimore explained in its opening brief that the production of pricing sheets will not allow the parties and the Court to identify what a borrower would have paid for a loan, or whether a borrower would have received any loan, but for discrimination by Wells Fargo. This is because of the extraordinary amount of discretion that Wells Fargo loan officers are given, as shown by declarations submitted by Baltimore from former Wells Fargo loan officers. Mot. at 3, 10-11.

Wells Fargo's response is that the parties and the Court should just "assume" that the borrower would have received the most advantageous price by "apply[ing] a simple pricing formula." Opp. at 3, 9. This will not resolve the problem. The testimonial evidence from Wells Fargo's own employees shows that loan officers' discretion is not limited to the four corners of a pricing sheet. Mot. at 10. The parties and the Court will therefore not even be able to use the pricing sheets to make the "worst-case" assumptions that Wells Fargo says should be made due to the absence of actual facts. Opp. at 3. The evidence from the former employees shows that even if the lowest price on a pricing sheet is a $1,000 monthly payment, for example, the loan officers had discretion to manipulate the loan to obtain a lower payment. Likewise, loan officers had discretion on the upper end to charge virtually unlimited points and fees. The pricing sheets, then, are not an adequate substitute for actual data based on actual loans. The only way to identify with precision the true cost, in dollars, of any discrimination by Wells Fargo is with a comparative loan file analysis that shows what Wells Fargo actually charged residents of both white and African-American neighborhoods.

6

What type of loan product a borrower would have received, and therefore which of the untold number of constantly changing pricing sheets to base this assumption on, is evidently yet another thing that Wells Fargo would have the parties and the Court try to guess.  Yet even if all of these guesses and assumptions were accepted for phase one, what would it accomplish?  If the assumption used for summary judgment after the first phase of discovery is that discrimination caused a particular borrower to be overcharged $5,000 in closing costs and $200 every month, for example, and the Court holds that this is enough to support causation, Wells Fargo would undoubtedly file a new summary judgment motion on the same property if data produced in a later phase of discovery shows that the actual overcharges were $2,500 at closing and $100 a month.  The current discovery plan virtually guarantees that this scenario will repeat itself at property after property.  Baltimore's plan is designed to avoid this time-consuming and costly duplication of effort by permitting the development of all facts needed to address causation during the first phase.

Even more fundamentally, in those cases where other life circumstances like a loss of a job or an illness might have contributed to the inability to pay, it will not be possible to know how much the Wells Fargo loan contributed to the default on the loan payments without knowing how the added cost of the discriminatory loan compared with the loss of income that resulted from the illness or job loss.  Illnesses and job losses are not invariably catastrophic.  They may last for limited periods of time, resulting in varying amounts of lost income.  Some may contribute significantly to a long term inability to pay, others may not.  Understanding the role these different factors played in the inability to pay is not possible without being able to quantify the cost of Wells Fargo's discriminatory practices.  This requires a comparative file review.

7

Finally, as with Baltimore's argument based on the Williams affidavit, Wells Fargo has no response to the City's explanation that pricing sheets cannot reveal whether a bad loan to a resident of an African-American neighborhood would have been made to a similarly-situated resident of a white neighborhood. Summary judgment as to these loans, even with all the speculation about pricing sheets advocated by Wells Fargo, would not be viable.

C. **Wells Fargo's Explanation of How Discrimination Plaintiffs Prove Liability Is Contradictory, Based On a Misrepresentation of How Baltimore Will Prove Its Case, and Not Relevant to the Issue of What Discovery Is Needed to Test Causation**

Instead of addressing Baltimore's arguments, the heart of Wells Fargo's opposition is a lengthy discussion of the different kinds of plaintiffs, evidentiary burdens, methods of proof, and *prima facie* elements in discrimination cases. *See* Opp. at 5-10. All of this discussion about the minutiae of how plaintiffs can establish liability for discrimination is inapposite. The instant motion is about the discovery needed to test on summary judgment whether the added cost of individual loans attributable to discrimination contributed to the borrower's default. It is not about how Baltimore may or may not prove the underlying discrimination.

Moreover, Wells Fargo gets the law wrong. For several pages, it appears to suggest that statistical evidence is not relevant when individuals bring discrimination suits (as distinguished from a government's pattern or practice case and class action suits). *See id.* at 5-8. On the next page, however, Wells Fargo does an about face and concedes that statistical analysis is relevant to a basic element of an individual discrimination plaintiff's case – namely, whether the individual was discriminated against. *See id.* at 9 (referring to fourth *McDonnell Douglas* prong, described on page eight of the brief as whether "the transactions were discriminatory").[1]

---

[1] Even aside from this concession, Wells Fargo's formalistic effort to fit this case into one of three preconceived boxes (pattern or practice, class action, or individual) is misguided because Baltimore alleges it has been harmed by systemic discrimination against its residents, not against itself.

8

Wells Fargo's concession is inevitable. Even the very cases Wells Fargo relies on here hold that statistical evidence is relevant without regard to the false distinction drawn by Wells Fargo between pattern or practice, class action, and individual discrimination cases. *See Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760-61 (4th Cir. 1998) ("[individual] plaintiffs may use evidence of a pattern or practice of discrimination to help prove claims of individual discrimination within the *McDonnell Douglas* framework"), *vacated on other grounds*, 527 U.S. 1031 (1999); *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 n.3 (4th Cir. 2004) (same, quoting *Lowery*); *Taylor v. Sec'y of the Army*, 583 F. Supp. 1503, 1509 (D. Md. 1984) (statistical evidence is "relevant in an individual, disparate treatment case"). Not surprisingly, the cases are clear that evidence showing a pattern of discrimination by Wells Fargo against residents of African-American neighborhoods in Baltimore would be probative of whether Wells Fargo discriminated against a specific resident from such a neighborhood.

Having contradicted itself and finally admitted – correctly – that statistical evidence of citywide discrimination is of central relevance in this case, Wells Fargo then makes another false argument. It asserts that Baltimore should not be allowed an inference of discrimination at each individual Wells Fargo foreclosure property on the basis of statistics establishing a citywide pattern of discrimination. *See* Opp. at 9. This argument is a red herring because Baltimore has never suggested that it can prevail based only on citywide statistics and without regard to evidence about what happened at each individual Wells Fargo foreclosure property.

Of greater significance in the context of the instant motion and the assessment of causation, Wells Fargo's assertion that Baltimore seeks "an overlay of a particular number of mean basis points" is likewise no more than Wells Fargo's invention. *See id.* at 9. The City is not asking the Court to permit a statistical analysis so that it can simply apply an average cost of

discrimination to every Wells Fargo property. To the contrary, a comparative loan file analysis will allow Baltimore to quantify the cost of discrimination at each property based on the unique circumstances of the individual borrower and individual loan. It will allow one to determine what an African-American borrower would have paid for the same loan had he or she been treated as similarly-situated white borrowers were treated. That is why discovery of the comparative loan data is so important here. Far from the blunt tool suggested by Wells Fargo, a regression will allow Baltimore to calculate the cost of discrimination at each property with the precision required for the Court to address causation on summary judgment instead of making the guesses and assumptions advocated by Wells Fargo.

Additionally, in a long footnote in this section of its brief, Wells Fargo repeats what it said in a prior submission about the discovery plan – that it would be hard to compile the loan information required for a comparative loan file review. *See* Opp. at 6 n.4; Defs.' Proposed Discovery Plan (Docket No. 200) (June 20, 2011) at 8 n.3. Yet there is good reason to believe that Wells Fargo has already collected at least much of the data in response to federal investigatory activity regarding the same kind of unlawful lending practices alleged by Baltimore. *See* Order to Cease & Desist & Order of Assessment of a Civil Money Penalty Issued Upon Consent, *In re Wells Fargo & Co.*, Nos. 11-094-B-HC1 *et al.* (Bd. of Governors of the Federal Reserve Sys. July 20, 2011).[2] While Wells Fargo states again that it is willing to submit an affidavit describing the burden of collecting the data, it still has not actually done so. Plaintiff respectfully submits that, at a minimum, Wells Fargo should be required to either (1) identify (in chambers if necessary) what it has already done to collect the data at issue or (2) submit an affidavit containing a detailed description of all the files and data regarding Baltimore loans that it has compiled or located for any purpose.

---

[2]  *Available at* http://www.federalreserve.gov/newsevents/press/enforcement/20110720a.htm.

**D.    The Third Section of Wells Fargo's Opposition Is Actually An Untimely Motion for Reconsideration of The Court's Decision Not to Order the Production of Documents That Have No Bearing on Causation**

Wells Fargo does not simply ask the Court to deny the City's motion for reconsideration. Rather, it uses its opposition brief to ask the Court for a second time to order the City to produce certain categories of irrelevant documents. Opp. at 10-11 & Proposed Order. The Court declined to do so after Wells Fargo made the same request in its discovery plan submissions prior to the August 10, 2011 hearing. Wells Fargo's renewed request is plainly a motion for reconsideration and should be rejected as both untimely and without merit.

In its submissions before the hearing, Wells Fargo contended that the Court should order the City to produce a range of documents under the pretense that the documents are relevant to why the borrowers defaulted on their loans, *see* Defs.' Proposed Discovery Plan (Docket No. 200) (June 20, 2011) at 9, even though the bulk of the documents concern damages or have no relevance to the case at all. For example, Wells Fargo wants the Court to order the City to produce information about "[m]unicipal expenditures" and vacancies. Opp. at 11. Such documents are plainly about damages, not why borrowers could not afford their Wells Fargo mortgage loans. They concern only what happened as a result of borrowers being unable to repay their Wells Fargo loans, not what caused their inability to pay in the first instance.

The Court declined to order the production of such documents. Instead, the Court identified the overall parameters for the first phase of discovery, which will not include damages, and instructed the parties to attempt to resolve any narrow disputes such as whether particular types of documents are relevant to why a borrower defaulted. *See* Tr. (Aug. 10, 2011) at 12. Document-specific discovery issues like the ones now raised for a second time by Wells Fargo should therefore be resolved in the usual fashion under Rule 37.

Moreover, any motion for reconsideration – which even just the length of Wells Fargo's three-page proposed order shows this to be – had to be filed within fourteen days of the Court's decision. *See* Local Civ. R. 105(10). Baltimore met this deadline but Wells Fargo did not, and the relief requested by Wells Fargo must therefore be denied.

### E.     Wells Fargo's Request for Fees and Costs Is Groundless

Wells Fargo does not argue in seeking fees and costs that the motion for reconsideration is frivolous or was not made in good faith. *See* Opp. at 12-13. To the contrary, Baltimore filed the motion to identify probative information about a Wells Fargo expert report that was not addressed at the August 10 hearing and to explain why the production of pricing sheets ordered by the Court at the end of the hearing will not solve the problem that the Court sought to address. Regardless of how the Court rules on the motion, it is well supported and was filed in good faith. The purpose of the motion is to raise issues at the outset of discovery that the City genuinely believes will save time and expense in the long run and assist the Court in resolving the issue it wants to address in the first instance.

Because Wells Fargo recognizes that the substance of Baltimore's motion for reconsideration provides no basis to seek fees and costs, Wells Fargo instead relies on two unfounded propositions: (1) that some unspecified authority somehow required the City to meet and confer about how to implement the Court's August 10, 2011 ruling before the City could ethically file a motion for reconsideration of that ruling, and (2) that if the parties had discussed how to implement the ruling, Wells Fargo would not have needed to prepare an opposition to the City's motion for reconsideration. Both are baseless.

As to the first proposition, there is no such authority. Wells Fargo's inability to cite anything more specific than "the rules" makes this clear. Opp. at 12. Baltimore had a right to

file its motion for reconsideration within fourteen days and did so. There is no authority that somehow conditioned that right on first discussing with Wells Fargo how discovery would proceed if the then-unfiled motion for reconsideration were to be denied.

As to the second proposition, the only way Wells Fargo would have incurred unnecessary fees or costs would have been if the parties actually did devote time to a meet and confer while Baltimore knew the time was likely being wasted because it anticipated filing the instant motion. A meet and confer would not have kept Baltimore from filing the instant motion or Wells Fargo from opposing it. And as discovery has not started, Wells Fargo cannot claim to have incurred any discovery related costs in reliance on anything that the City has done or not done.

There is no merit to Wells Fargo's contention that undersigned counsel acted improperly.[3]

## CONCLUSION

For the reasons set forth above and in Plaintiff Mayor and City Council of Baltimore's opening brief, Plaintiff respectfully submits that the Court should reconsider its August 10, 2011 ruling from the bench concerning the manner in which discovery will proceed. The Court should adopt a discovery plan under which discovery regarding the reasons why borrowers defaulted at the subject Wells Fargo properties proceeds concurrently with discovery that allows Baltimore to determine the financial impact on each borrower of any discrimination by Wells Fargo. This includes the discovery necessary for Baltimore to conduct a comparative loan file analysis of Wells Fargo's lending decisions in white and African-American neighborhoods.

---

[3] In addition, Wells Fargo misrepresents counsels' telephone call of August 16, 2011. *See* Opp. at 12. The City indicated during that call that it needed to review the transcript to determine how it wanted to proceed (the full transcript was not available until August 22, 2011), a position entirely consistent with filing a motion for reconsideration. Moreover, the City's counsel did not enter an agreement to discuss with defense counsel the following week how to implement the bench ruling (the date eventually suggested by defense counsel was August 28, two days after the City filed the instant motion, and it was never agreed upon). Nor was the City's counsel obligated to reveal to defense counsel during the phone call that it might seek reconsideration.

Furthermore, the Court should deny Wells Fargo's requests in its opposition brief for (1) an order requiring Baltimore to produce documents about damages during the first phase of discovery and (2) fees and costs.

Dated: August 30, 2011

Respectfully submitted,

/s/ John P. Relman
John P. Relman, MD Fed. Bar No. 11482
Glenn Schlactus, *pro hac vice*
Tara K. Ramchandani, *pro hac vice*
RELMAN, DANE & COLFAX, PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888
(202) 728-0848 (fax)
jrelman@relmanlaw.com
gschlactus@relmanlaw.com
tramchandani@relmanlaw.com

*Special Assistant City Solicitors and Attorneys for Plaintiff*

George Nilson, City Solicitor, MD Fed. Bar No. 01123
Suzanne Sangree, Chief Solicitor, MD Fed. Bar No. 26130
City Hall
100 N. Holliday Street
Baltimore, Maryland 21202
(410) 396-3297
(410) 659-4077 (fax)
George.Nilson@baltimorecity.gov
Suzanne.Sangree@baltimorecity.gov

*Attorneys for Plaintiff*